THE PEOPLE *ex rel.* Chicago Bar Association, Relator, *vs.*
Roy O. GILBERT, Respondent.

*Opinion filed April 23, 1914.*

1. DISBARMENT—*exceptions to commissioner's conclusions of law from facts found are unnecessary.* The question whether the commissioner in a disbarment proceeding has drawn correct legal conclusions from the facts found may be heard without any exceptions, as exceptions relate only to matters of fact.

2. SAME—*commissioner's findings of fact are conclusive if evidence is not brought up.* If the respondent in a disbarment proceeding does not bring to the Supreme Court the evidence upon which the commissioner's findings of fact are based such findings are conclusive, and the only question is whether the facts found warrant the commissioner's conclusion that the respondent should be disbarred.

3. SAME—*court is not bound to accept opinions of attorneys as to fees.* In a disbarment proceeding the Supreme Court, in considering whether the respondent has charged an ignorant client an exorbitant fee, is not bound by the opinions of attorneys as to the reasonableness of the charge, but will take into consideration its own knowledge as to what would be the usual charge between persons competent to contract and free to do so.

4. SAME—*attorney has no right to occupy position where his interest conflicts with his client's.* An attorney has no right to occupy a position where his interest in commissions on loans of his client's money causes him to make or recommend undesirable loans upon greatly inadequate security, and he cannot excuse his conduct upon the ground that he made the loans with the knowledge of his client, who was a poor woman, ignorant of business affairs and relying upon him to get proper security for the loans.

5. The court reviews the commissioner's findings in this case and confirms his recommendation that the respondent's name be stricken from the roll of attorneys for unprofessional conduct in dealing with a client.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

CHARLES R. NAPIER, for respondent.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

By leave of court an information was filed in the name of the People of the State of Illinois, on the relation of the Chicago Bar Association, against the respondent, Roy O. Gilbert, charging him with unprofessional conduct as attorney for Catherine M. Bobb and praying that his name be stricken from the roll of attorneys of this court. The information was answered, and the issue was referred to William A. Doyle, one of the masters in chancery of the circuit court of Cook county, as commissioner of this court, to take and report the evidence, with his conclusions. The commissioner took the evidence and made a report of his findings of fact therefrom and his conclusion that the prayer of the information should be granted, and submitted the report to the relator and respondent. The respondent filed objections with the commissioner, which were overruled, and there was a stipulation that the objections should stand as exceptions in this court.

The respondent has not brought to this court any of the evidence in the cause, and exceptions to conclusions of law from facts found are not necessary. Exceptions relate only to matters of fact, and any question whether an incorrect legal conclusion has been drawn from the facts found will be heard without an exception. (*Hurd* v. *Goodrich,* 59 Ill. 450; *Hayes* v. *Hammond,* 162 id. 133; *VonPlaten* v. *Winterbotham,* 203 id. 198; *Gillett* v. *Chicago Title and Trust Co.* 230 id. 373.) The findings of the commissioner as to matters of fact have not been questioned by bringing to the court the evidence on which they were founded, and are therefore conclusive, and the only question to be considered is whether the facts found warrant the conclusion that the respondent's name should be stricken from the roll of attorneys.

The facts are as follows: There was a divorce suit in the circuit court of Richland county, Wisconsin, between

Catherine M. Bobb and her husband, John Bobb, in which there was a trial on September 12, 1911, and a decree on November 4, 1911, granting a divorce and allowing to Mrs. Bobb alimony in the sum of $2000, with temporary alimony until the same should be paid, with costs of suit. Under that decree $2023 alimony was paid to the clerk of the circuit court at Richland Center. For about eight years the respondent had advertised himself as an attorney in the *Chicago Daily News,* and the advertisement for November 20, 1911, was as follows: "Roy O. Gilbert, Attorney and Counsellor, practices in all courts; moderate charges and easy terms.—Room 512, 58 W. Washington St." On November 23, 1911, Mrs. Bobb called at the office of the respondent with a clipping of that advertisement and told him that she had been beaten out of all she had; that she had been given $3000 in the divorce proceedings but her attorneys had charged her $1000. She gave him a letter from her attorneys, and he wrote to the clerk of the court enclosing his check for two dollars for a certified copy of the decree. She afterwards gave him other letters from her attorneys, and on the day after the first interview she went again to the office and had an interview with him, when the following contract was made:

*"Nov. 24, 1911.*
"This is to certify that I have this day retained Roy O. Gilbert to take my case against John Bobb, and agree to give him for his services one-half of all I receive over the sum of $2000 and a reasonable fee if only that amount is obtained for me, in addition to his expenses in either event.    MRS. CATHERINE BOBB."

On or about November 25, 1911, the respondent received a certified copy of the decree, and between that time and December 27, 1911, he wrote several letters to the attorneys at Richland Center, Wisconsin, and to the clerk of the circuit court and the First National Bank at the same place. The attorneys replied, giving him a full explanation of the divorce proceedings, with a copy of the

findings of the court, and in a letter dated December 7, 1911, they wrote him that they had, since writing the former letter, received a letter from Mrs. Bobb charging them with fraud, theft, embezzlement, and nearly everything else in the category of crimes, and claiming they had charged her $1000. The fact was that they had been allowed by the court $150 and the alimony had been paid in full, and they stated as their opinion that she was evidently insane or at least incompetent to have the management of her own affairs, and suggested that a guardian should be appointed to receive the money for her protection and their own, as they feared she would waste the money if she had it in her hands. The respondent replied on December 11, 1911, saying that Mrs. Bobb was not insane; that the trouble arose out of the desire of another woman to make it as hard as possible for Mrs. Bobb to get her money, and that Mrs. Bobb talked and acted as any half-starved woman would. As a result of the correspondence with the clerk of the court and the First National Bank the respondent sent a receipt executed by Mrs. Bobb, and a satisfaction of the decree, to the bank. The clerk paid the money in his hands, being the sum of $2023, to the bank, and on December 27, 1911, the bank forwarded it to the respondent, less collection charges of $2.50. When the draft was received, the respondent, with the knowledge and consent of Mrs. Bobb, deposited the money in a bank in Chicago in his own name, retaining $11 advanced to her in December and $225 for his services. In the meantime the respondent had secured a position for Mrs. Bobb with the employment agency of Lulu Munger at four dollars per week, which she held about four or five weeks. While she was in that employment Lulu Munger spoke to her about borrowing money from her. After receiving the draft the respondent talked with Mrs. Bobb about loaning $550 to Lulu Munger, and said that he would not let her have that much. The respondent, however, did loan Lulu Munger $550 and

received from her $50 for making the loan. That money was received with the knowledge of Mrs. Bobb, but she left the matter entirely in the hands of the respondent, relying upon him to see that she got her money back. He took a note dated January 2, 1912, signed by Lulu Munger, for $550, payable to the order of Mrs. Bobb in monthly installments of $10 each, at his office, with interest at seven per cent, payable semi-annually, and to secure the payment of the note Lulu Munger made a chattel mortgage on some office property and assigned the lease of her room. The property was not worth more than $100, and only $10 was ever paid on the note, which was on February 5, 1912. Shortly after the note was made the landlord distrained all of the property of Lulu Munger for rent and the note was worthless. On January 8, 1912, the respondent, without the knowledge of Mrs. Bobb, loaned Irving A. Weekes $85 on his note, due in six months, payable to her order, with interest at seven per cent. On January 13, 1912, the respondent, with the knowledge of Mrs. Bobb, loaned to Weekes an additional $60 on his note, payable in six months to her order, with interest at seven per cent. The respondent received from Weekes for fees and expenses in making these loans $15. As security for the loans the respondent held an unrecorded deed to twenty acres of Michigan land and an unrecorded mortgage of Michigan land securing the payment of notes of William F. Nutt, trustee. On March 1, 1912, Mrs. Bobb withdrew her notes, papers and business from respondent, and afterward, on November 22, 1912, $29 was credited on the second note of Weekes, paid to Mr. Coy, who had the note for collection, and it is agreed that after the evidence in the case was taken $79 has been realized out of the Weekes loans. On January 8, 1912, the respondent gave a check to Taylor A. Snow for $725 for the purchase of a note of that amount, payable in monthly installments and secured by second mortgage on real estate in Cook county. This is known as the Raedell loan, and the

payment of the note was guaranteed by Taylor A. Snow, who was solvent and good for the debt. The respondent introduced Mrs. Bobb to August Renner, and she went to work for him in his printing office and worked four or five weeks at four dollars per week. On January 18, 1912, the respondent loaned $400 of her money to Renner on his note, due in one year, payable to her order, with interest at six per cent, and took a chattel mortgage on machinery and the outfit of the printing establishment. The mortgage was the third mortgage on the property, and on January 15, 1913, one mortgage was foreclosed on most of the property, and on January 18, 1913, another mortgage was foreclosed taking the remainder, excepting an electric motor, which was rented from the General Electric Company. The general reputation of the respondent for honesty and integrity during the years 1911 and 1912 was good.

These are the facts from which it is to be determined whether the respondent is a proper person to hold the license of this court to practice as an attorney. Mrs. Bobb saw his advertisement in the "Wanted" columns of a daily newspaper as an attorney and called at his office and told him about the divorce proceedings, claiming that $3000 had been allowed her, instead of $2000 and temporary alimony in fact allowed. He made a contract with her by which he was to receive one-half of all he secured over $2000, and a reasonable fee if only $2000 was recovered. He obtained a copy of the decree and found that she had been allowed only $2000, with temporary alimony until it should be paid, and that $2023 was on deposit with the clerk of the circuit court. He then learned that she had no claim against her attorneys, and from that time his only efforts in her behalf were to have the money paid over. He rendered no services requiring any legal knowledge and no substantial service of any kind. He had nothing to do with the payment of the money except to send the receipt and satisfaction of the decree, and the only service rendered

would have been performed by any banker for a trifling fee. He knew that she was a poor woman, for he wrote that she had no money to take the trip to Wisconsin and get the money in the clerk's hands which belonged to her. The money was ready for her, and he knew that she could have gone to Wisconsin and obtained the money herself at the expense of a few dollars. All that he did was to save her the expense of a journey to Richland Center, Wisconsin, or the small charge of a banker. Twice he secured a place for her at four dollars per week, from which she had to meet her living expenses, and for transferring all her worldly possessions from the clerk of the court to himself he deducted $225. The respondent testified that he spent fifty hours' time in attention to the business of Mrs. Bobb, and attorneys appeared before the commissioner and testified that the services stated by him were reasonably worth $225, but the commissioner gave no credence to either testimony and was right in not doing so. There was no legal question involved and no investigation required except to learn the facts by writing letters, and the respondent could not have employed fifty hours in doing that. The courts are not bound by opinions of attorneys concerning what is a reasonable charge for legal services, but are responsible to litigants for the use of their own knowledge of the value of such services, and ought to, and will, take into consideration such knowledge. (*Goodwillie* v. *Millimann,* 56 Ill. 523; *Metheny* v. *Bohn,* 164 id. 495; *Gentleman* v. *Sanitary District,* 260 id. 317.) And the question in such cases is what the usual charge would be between parties competent to contract and free to do so. (*Reynolds* v. *McMillan,* 63 Ill. 46; *McMannomy* v. *Chicago, Danville and Vincennes Railroad Co.* 167 id. 497.) We cannot understand by what process of reasoning attorneys could conclude that a woman who had $2023 when she employed an attorney, and two months and four days after the attorney received her money, when she withdrew her papers

and business from him, she had received $80.34 from him, and had, at most, the prospect, if existing loans should be paid, of finally receiving about $1000, was the beneficiary of services worth $225, or that any business man or woman capable of contracting would have agreed to pay $225 for all of the services rendered, from first to last, by the attorney. We are sure that opinions of that kind do not generally prevail among attorneys, and we agree with the views of the commissioner on that subject.

We also agree with the commissioner that the making of the loan to Lulu Munger on chattel property worth less than one-fifth of the loan was a gross neglect of duty; that the act of taking $50 from her for making the loan was reprehensible, and that the knowledge of an ignorant client did not excuse respondent. He had no right to occupy a position where his interest conflicted with his duty to his client, even if she knew it while relying upon him to see that the money was securely loaned. The loans of Weekes and Renner were without such security as any person of ordinary judgment would have required, and the purchase of the second mortgage notes of Raedell were not proper investments with the funds of a client such as Mrs. Bobb, although the amount might finally be recovered by redemption from the first mortgage, which she would be unable to make, or be recovered on the guaranty of Snow. The respondent well knew that his client was a poor woman, unable to earn a comfortable living, and that the means in his possession constituted her whole estate. The proper function of an attorney is to conserve and protect the interests and property of his clients and not to divest them of their property and estate. The facts found justify but one conclusion, which is, that the respondent ought not to bear the license of this court to practice the profession of law and thereby induce persons requiring the services of an attorney to repose confidence in him and entrust their property and interests to his care.

The report of the commissioner is confirmed. The rule is made absolute, and the name of the respondent will be stricken from the roll of attorneys of this court.

*Rule made absolute.*