THE PEOPLE *ex rel.* The Chicago Bar Association, Relator,
*vs.* WILLIAM G. ANDERSON, Respondent.

*Opinion filed April 20, 1916.*

ATTORNEYS AT LAW—*when an attorney will be suspended.* An
attorney who accepts money from a client to institute a suit and
who falsely represents that the suit has been brought but does not
bring the suit until after disbarment proceedings have been be-
gun against him, more than two years after he accepted the money,
is guilty of unprofessional conduct and will be disciplined, par-
ticularly where other similar charges against him are made and
proved; but if the evidence does not show a corrupt motive he
will be suspended from practice and not disbarred.

DUNN, CARTWRIGHT and COOKE, JJ., dissenting.

ORIGINAL information to disbar.

ROSWELL B. MASON, and JOHN L. FOGLE, for relator.

F. L. BARNETT, for respondent.

Mr. CHIEF JUSTICE FARMER delivered the opinion of
the court:

This is a proceeding instituted for the disbarment of
William G. Anderson, a member of the bar of this State,
practicing his profession in the city of Chicago. The in-
formation was filed by the Chicago Bar Association, as re-
lator, at the June, 1914, term of this court, and contained
four counts. An additional count was later added. The
respondent filed·his answer at the February term, 1915,
denying the charges made. The cause was referred to a
commissioner and evidence was heard as to three of the
original counts and the additional count. The commissioner
found and reported that in his opinion the testimony sus-
tained the charges, or some of them, and that respondent
had been guilty of unprofessional and dishonorable conduct.
Respondent has filed exceptions to the finding of the com-
missioner.

The first count of the information charged respondent with having received in 1911 $42.50 from David Graves, a porter in the employ of the Pullman Company, for costs and payment for services in instituting a suit for divorce, and that he failed to do or perform any services with reference thereto, except to file the bill for divorce. The proof with reference to this count showed that in October, 1911, Graves called on respondent at his office and told him he wanted a divorce from his wife, charging adultery and desertion, and $42.50 was then agreed upon as the amount to be paid both for expenses and attorney's fees, and Graves then paid respondent $20. In November following he paid respondent another $20, and on November 27 paid respondent $2.50, the balance of the sum agreed upon. Receipts were taken for these different payments. Graves testified that upon his first visit to respondent he detailed the facts upon which his charges for a divorce were based and was told by the respondent he would have a divorce ready by Christmas, 1911; that in January, 1912, respondent told witness the holidays had caused some delay but that he could look for his divorce in a few weeks; that in April, 1912, respondent told the witness the case was on file and would be all right soon and that he would call up the witness and let him know. In July and in the fall of 1912 respondent, when called upon by Graves, made various excuses for the delay, among which was the summer vacation, but promised witness he would surely have the divorce for him by the following Christmas. During the spring of 1913 witness on several occasions called on respondent but was always given excuses for the court's delay. In November or December, 1913, witness called on respondent and took him to interview some witnesses, and was then again told his divorce would be given to him as a Christmas present that year. In February, 1914, the respondent informed Graves the case was on file. April 9, 1914, charges were filed with the Chicago Bar Association with reference to

this matter, and the next day, April 10, 1914, respondent filed the bill for divorce for Graves, who testified he first learned no bill had been filed when he called at the office of the bar association in April, 1914. Respondent admits the payment of the money to him on the dates mentioned, but testified Graves told him not to bring the suit until he had procured the evidence necessary; that he did not see Graves until about a year after the date of the last payment, when they met on the street, and he was then told by Graves that he had not made up his mind to proceed; that he subsequently saw Graves a couple of times and went with Graves to see some witnesses, but testified that Graves was not yet ready to file the suit as he was thinking of giving his wife another chance; that on March 25, 1914, Graves finally told respondent to file the suit, which he accordingly did April 10, 1914.

The second count charges respondent with failure to carry out an agreement entered into the early part of June, 1913, with Carrie Elder, by which he was to institute proceedings to secure a divorce for Mrs. Elder. The proof showed that in June, 1913, respondent called on Mrs. Elder at her request and was told she desired to secure a divorce from her husband, an inmate of the poor farm at Oak Forest, Illinois. Thirty dollars was agreed upon as the amount to be paid and $20 was then given respondent. A daughter of Mrs. Elder testified she was present when respondent visited her mother and that the husband from whom the divorce was desired was at that time in the kitchen of the home and that the witness asked respondent if he wished to talk to him, and that respondent said no, it was inadvisable to do so; that they wanted to say they did not know where he was and advertise for him. Unsuccessful efforts were made by both Mrs. Elder and her daughter to induce the respondent to proceed with the divorce action. Shortly after this complaint was filed with the bar association respondent returned to Mrs. Elder the $20 she had paid him.

Respondent's answer to this charge is, that after talking with Mrs. Elder he learned her husband was an inmate of one of the institutions at Dunning, not crazy or adjudged insane but not right mentally; that he did not file the bill under those disclosed conditions and upon demand returned the money to Mrs. Elder.

The third count charged respondent with having obtained money from Mrs. Rosa A. Morgan paid him for expenses and services to be incurred and performed in procuring for her a divorce and his failure to make an effort to do so. The proof showed respondent called upon Mrs. Morgan at her place of business, and at her request, September 24, 1913; that she told him she desired to secure a divorce on the ground of impotency, and he agreed to get the divorce for $35, and she then gave him her check for $15.85, which she understood was to pay the costs of instituting the suit. About a week later she called respondent by telephone with reference to the divorce and he told her he was busy. Respondent sent a boy from his office to see Mrs. Morgan and asked her for $10. This she refused to pay until something further had been done toward bringing the suit. Either a few days before or after the boy called on Mrs. Morgan and asked for the money respondent called on her and had her sign a paper, presumably a bill, though Mrs. Morgan did not know what it was as she never read it. Mrs. Morgan testified she later saw respondent in a restaurant and also had numerous telephone conversations with him, and that he told her he was working on the case but that her husband objected to her securing a divorce and had retained a lawyer, and because of this he could go no further at that time. It is not clear whether respondent ever told Mrs. Morgan he had filed her bill of complaint, but it appears he either so told her or at least led her so to believe. In December, 1913, Mrs. Morgan employed another lawyer, who told her no suit had been begun, and who wrote respondent December 9, 1913, he had been retained. A

decree of divorce was granted Mrs. Morgan in February, 1914. In April counsel last employed by Mrs. Morgan wrote respondent for a return of the $15.85 paid him by Mrs. Morgan, and received an answer promising to send a check for the same in four or five days. Respondent, in answer to this charge, claims he went to see Mrs. Morgan with reference to securing a divorce for her on the ground of impotency; that a price was agreed upon and $15.85 was then paid him, Mrs. Morgan agreeing to pay him $10 more in a week or so if he would call or send for it, and that she would pay him the remainder upon the hearing of the case; that he accordingly drew the bill and sent for the $10, which was not paid; that he later called on Mrs. Morgan and had her sign the bill and asked her for the $10, but she said she could not pay it then and that he would have to wait, and that he heard no more from her until notified by counsel later employed by her that he had filed a bill. Respondent testified he never told Mrs. Morgan the suit had been filed, but claimed she refused to carry out the contract and pay the $10 agreed to be paid before the suit was filed. Respondent further testified he told Mrs. Morgan, both at the time of first calling upon her and at the time he called to get her to sign the bill, that he had never brought an action for divorce charging impotency and that he would have to look up the law, and that he was not quite sure she had a good cause of action since she had lived with her husband several years and complained of his impotency as of the present time. Respondent further testified he told Mrs. Morgan at a picnic, in the summer of 1914, he would retain $10 of the $15.85 for services rendered and expenses and offered to return to her the balance, $5.85.

The added count charges the respondent with obtaining money from David Bogie and Fred W. Jones, inmates of the penitentiary at Joliet, or from relatives and friends of said inmates, on the false representations that he was able

to secure their pardon or parole, largely through his influence with the chief executive of the State. The proof on the part of relator tended to show respondent called on David Bogie at the county jail in June, 1911, after Bogie had been convicted of murder; that after Bogie was taken to the penitentiary, Miss Harris, a friend of his, called on respondent at the suggestion of Bogie, and respondent told her he thought he could get Bogie out and that he would take his case for $200, $100 to be paid before and $100 after he got the pardon or parole. In all $105 was paid respondent by Miss Harris, and though respondent made one or two trips to Joliet to see Bogie, no attempt was made to bring the matter before the board of pardons or take the record up for review. Miss Harris testified she called upon respondent often, and he told her the Governor was a friend of his and he could get Bogie out. Respondent admits seeing Bogie in the county jail and the receipt of the money and the calls from Miss Harris and that he agreed with her to do what he could for $200. He denies that he said he had great influence with the Governor, and claims that he made examination of the records in the case and made several trips to see Bogie; that nothing was said about when he was to make application for a pardon, about which he was to exercise his best judgment, and that in the exercise of such judgment he had not, up to the time he testified, made application for a pardon but intended to do so at the next meeting of the board. Respondent testified he was willing to return to Miss Harris the money she had advanced or given him, less a reasonable amount for the services he had performed.

The added count also charged respondent with securing money from the relatives of said Fred W. Jones by means of similar false representations. Jones was convicted of murder in January, 1913, and sentenced to the penitentiary for twenty years. A brother and the mother of Jones testified to interviews had with respondent in which he told

them he could help get the son out of the penitentiary because he was going to campaign the State for Gov. Deneen, and would do so for $150.   In all $139 at different times and in various amounts was paid respondent, who with the brother went to Joliet and saw said Jones.   After the election of Gov. Dunne the respondent said the Governor elect was a personal friend of his, and gave the impression that because of such friendship he could secure the pardon or parole.   No writ of error was ever sued out to have the judgment of conviction reviewed nor was any application for pardon or parole ever filed with the board, although witnesses for relator testified respondent told them at different times the case would be brought before said board. Respondent denied ever having told the mother or brother of the said convict that he could secure a pardon or parole because of his influence with either Gov. Deneen or Gov. Dunne, but testified that he agreed to, and did, look up the records in the case and visited said Jones at the penitentiary and decided to apply for a pardon or parole, and that application would be made at the April, 1915, meeting of the board of pardons, although it had not yet been filed at the time of the hearing.   Respondent further testified no demand had been made on him for a return of the money paid, and that he did not know there was any dissatisfaction with the way he handled the case until the hearing before the commissioner, and that he was willing to return a reasonable amount of the money received if his services were no longer desired.

The commissioner found the delay and conduct of respondent as charged in the three original counts was his fault and not that of his clients; that his explanation of the different charges was unsatisfactory and that his action in regard to the first count was unprofessional and dishonorable; that he should at least be disciplined because of the facts shown in support of the second count; and that as to the third count, the facts showed a low conception of duty

on the part of respondent. The commissioner found the proof sustained the charges made in the additional count with reference to both the Bogie and Jones cases, and that the conduct of respondent with reference to such cases was unprofessional, dishonorable and constituted malconduct in respondent's office as an attorney.

The most serious question we have had to determine in this case is whether the rule should be made absolute and respondent disbarred, or whether a suspension from practice for a definite period named and until restored by order of this court would sufficiently serve the purpose of the prosecution. After careful deliberation we are inclined to adopt the latter course. We are led to this conclusion, not because we are of opinion the commissioner's conclusion that respondent's conduct has been unprofessional and dishonorable is wrong, but because we incline to the belief that that degree of culpability is not shown by such clear and satisfactory evidence as to leave no ground for the exercise of a discretion between disbarment and suspension. We do not purpose in the slightest a retrogression from the position the court has always taken with reference to unprofessional or dishonorable conduct of members of the bar, and when convinced by satisfactory evidence that such conduct has been attended with corrupt motives we will unhesitatingly deprive the guilty party of the right to further practice his profession. We are determined that, so far as this court is concerned, members of the bar will be required to square their conduct by the rules and principles of honesty, truthfulness and fair dealing, but we are not convinced that every dereliction should be visited with the same consequences. In this case we think the proof warrants disciplining respondent. His explanations of his acts are not sufficient to warrant discharging the rule, nor do we think, from a consideration of the evidence, that his absolute disbarment is required.

The judgment, therefore, will be that the respondent be suspended for a period of two years and until restored by order of this court.     *Respondent suspended.*

DUNN, CARTWRIGHT and COOKE, JJ., dissenting:

The respondent received money for services to be rendered and kept the money without rendering the services, in the meantime deceiving his clients by false statements as to their cases. He returned a part of the money when charges were made against him and prosecution was imminent. He had a license to practice law, which he used to obtain money dishonestly. He should be permanently deprived of the opportunity to do this and his name should be stricken from the roll of attorneys.