(No. 27014.—

IN RE HERMAN F. HALLMANN, Attorney, Respondent.

*Opinion filed November 16, 1943.*

CHARLES LEVITON, *amicus curiae.*

HERMAN F. HALLMANN, *pro se.*

Mr. Justice Gunn delivered the opinion of the court:

Respondent, Herman F. Hallmann, was admitted to the bar in October, 1922. November 2, 1942, the Committee on Grievances of the Chicago Bar Association, as commissioners of this court, filed a report finding the respondent guilty of unprofessional conduct and recommending his suspension from the practice of law for a period of two years. Upon motion by the *amicus curiae* made in this court, to approve and confirm the report, respondent was ordered to show cause why the rule should not be made absolute and his name stricken from the roll. Respondent answered, asking the recommendation of the commissioners be accepted. He later filed a brief and argument in the case, which concludes with a prayer that the findings of the commissioners be sustained in case he has failed to convince this court of a lack of intent to do wrong; or, if the report shows him to be innocent of wrong-doing that the charges be dismissed.

The record before us consists only of the report and recommendation of the commissioners. Any question as to whether an incorrect legal conclusion has been drawn from the facts will be heard by this court without exception. (*People ex rel. Chicago Bar Ass'n* v. *Gilbert*, 263 Ill. 85.) The record is open to determine legal conclusions to be drawn from the facts to be reported, but the only question to be considered is whether the facts warrant the conclusion of the commissioners, and, if they do not so justify the report, it is for us to determine what conclusion is warranted by the reported facts.

There are four complaints filed against respondent, the first of which was filed by Fred Wiegel, followed by the complaints of William R. Maxwell, Homer Martin and Charlotte Gann. The respondent states in his brief that after the complaint of Wiegel was filed the hearings were not held confidential, but broadcasted, causing him to give up his office and practice from the date of the filing. This

information, it appears, was given out by the original complaining witness without the consent or knowledge of the *amicus curiae*. Its effect, however, was injurious to respondent; and care should be taken to call to the attention of complainants and witnesses that rule 59 requires such hearings to be held privately until a report is filed.

Wiegel's complaint charges that for fifteen years respondent had been his attorney in all of his business transactions, in whom he placed complete confidence, and that during said time respondent handled the legal details of all of his dealings, was his adviser and agent in financial transactions, and was retained to pay State, federal and county taxes, and to make mortgage-interest payments, and to secure insurance on his properties, and acted in a great many other matters. The complaint, as filed by him, makes charges more damaging than his proof. Wiegel claims he paid to respondent $500 to apply upon a mortgage payment; $329 for discharging unemployment compensation taxes; that he had received $200 on a rebate voucher from the city of Chicago, and had received payments on a judgment not accounted for. He also claimed he had placed in respondent's hands $3000 represented by notes signed by respondent, at six per cent interest, accompanied by a letter which declared it to be an investment, and also had made personal loans aggregating $550, and that none of these items had been repaid.

The respondent admits he used the $500 which was paid for the purpose of applying on the mortgage, and that he had received $188 which should have been applied to unemployment compensation payments, and had received $150 from the city of Chicago voucher, and $100 additional on a judgment. However, he claimed he had rendered services during many years for which he was not paid, and had made a $1000 payment, not credited, on a note. Wiegel's claim, including interest on the note, amounted to over $6000, after he had given credit for all

payments. The credit statement of Wiegel is interesting. It shows a total payment by respondent over a period of ten years of $1695.98, of which only the sum of $217.32 represented credit for legal fees and costs. The balance of $1478.66 was acknowledged to be received by Wiegel in cash, thus showing he credited respondent with $200 for all legal services during a period of ten years.

The commissioners report the facts to be complicated, and held many hearings. One of the commissioners in the presence of both parties summed up the situation as showing respondent had received $938 from Wiegel in a trust capacity, which he had failed to apply for the purposes designated, made up of the admitted items above, and that respondent was entitled to a credit of $1000 on the $3000 note, and that these items represented all that was between the parties, and to this both of them agreed. Later Wiegel and respondent agreed upon the sum of $1900 as the amount due, which is shown to have been paid in full.

The commissioners make a further report that the proof fails to show any lack of moral turpitude in the matter of the $3000 note claimed by one party to be for investment, and the other as a loan. These facts, boiled down, show respondent received $938 for a specific purpose covering various items, and that he should have applied the amount to such purposes, regardless of whether he was able to get a settlement for the amounts due for legal services, or credit payments on the note. When an attorney undertakes to have commercial dealings with his client he has not the full right of a person dealing at arm's length with another of adjusting accounts by offsetting one claim against the other, but must rigidly apply monies paid for a specific purpose to such purpose. Where the transaction involves a commercial deal, without any elements of trust, the rule may be different.

Applying these principles the report shows Wiegel made excessive claims; that he did not give full credit for all

amounts paid; that apparently he gave no consideration to amounts he might owe his attorney for fees. On the other hand, the respondent, without any lawful right under the conditions, applied monies which he had received in a trust capacity to liquidate his own claims. This an attorney at law, under the situation, is not permitted to do.

The complaint of William R. Maxwell involves money paid to respondent in closing a real estate transaction. He was paid $300 in cash. The money was all accounted for except $161.85, which respondent admitted he was holding for the purpose of paying special assessments on the property purchased. He did not pay this money on special assessments, and the property was sold. However, it appears from his own statement, and there is testimony reported which indicates it is probably truthful, that he turned it over to a Mr. White, who was in the business of obtaining reductions in the settlement of delinquent taxes, to obtain, as the evidence shows, "cuts" under the amount due. Apparently White did not succeed, and respondent testified White is now paying him in installments not only this amount, but other amounts entrusted to him for that purpose, aggregating over $900. On complaint made by Maxwell he was repaid the money, together with sums to take care of his time and expenses. It is contended by respondent he informed Maxwell of his intentions in this matter, but the latter denies it. It is undoubtedly a procedure which should not be adopted without the express consent of the client, and certainly not without keeping him informed as to whether the property involved is being sold for nonpayment. It does not, however, show an intent to convert money to his own use, but to benefit a client through a hazardous and dubious method.

The complaint of Charlotte Gann is to the effect she made two payments aggregating $65, for which respondent was to file a complaint for divorce; that respondent kept informing her the complaint had been filed, when as

a matter of fact it never had been filed; and that he took certain depositions of herself and relatives for the purpose of deceiving her; and that later she procured another attorney, and found the divorce had not been filed. The explanation of the respondent is wholly inadequate. His claim was he was to receive a total of $75, and that he held the matter up until it was all paid, and that she knew the divorce was not to be filed until the fee and costs were paid in full. Respondent has repaid to Mrs. Gann all of the money delivered to him.

The complaint of Homer Martin involved $26 paid for court costs in a divorce suit to be instituted by him; that he was told the divorce suit had been filed, and that it never had been filed. The facts in the case are out of the ordinary. Martin's wife had a decree against him for separate maintenance. Respondent, however, gave to Martin a letter certifying his case had been filed. Martin had been previously informed by his attorney in the separate maintenance proceeding a certain amount of time would have to elapse before he could get a divorce. Complainant went with respondent to talk with one of the judges, and stated that in the conversation with the judge he called to his attention that he had formerly worked under him; that he was informed by the judge he was not sitting in a court that handled such a case, but if the matter was passed back to him he would see what he could do. Respondent's contention is he thought he could convince Martin's wife to consent to amending the complaint, and procure a divorce, and went to see her with the complainant for such purpose; and that it developed in the conversation that Martin expected to marry his sister-in-law, and that the wife agreed to give him a divorce with the understanding he never marry the sister-in-law, and that was where the matter stood at the time of the filing of the complaint.

After hearing all of the testimony, the commissioners, after condemning the actions of respondent, reported there

were circumstances militating in behalf of the respondent which should mitigate the discipline recommended, and since all sums in controversy had been paid, except that of Martin, recommended a suspension of two years.

The answer of Hallmann shows he was engaged in the mortgage and insurance business as well as the practice of law. It is a fair conclusion he must have been more familiar with the practice of such business than the requirements of a practicing lawyer. The report undoubtedly discloses facts which require us to discipline respondent. As pointed out, he had no justification, as an attorney, to apply money, paid to him by Wiegel for a special purpose, to reimburse himself, however unjust might have been the attitude of Wiegel. His actions, however, do not indicate an intention to embezzle. It simply shows ignorance of his duties as an attorney, and the lack of knowledge of professional requirements.

Respondent's actions in the Maxwell matter show gross carelessness, and a failure to follow up the interests of his client. If his story be true, and there is some indication that it is, that he turned the money over to a tax agent and left it in that way, without following it up and seeing that his client's rights were protected, it shows gross carelessness and disregard of the client's rights, but it is not shown to be criminal or fraudulent. His actions with regard to Mrs. Gann show he deceived her with respect to filing the case. He had an undoubted right to require the fee and the costs to be paid before he started the suit, but he should have made this matter clear to her when he received a partial payment from her. He undoubtedly failed to do this, and we can find no justification for his actions.

In our opinion the Martin matter is excusable, although it is clear he did not explain to his client how he was attempting to procure the divorce. Martin was bound to know, with a decree for separate maintenance against him,

together with the advice of his former lawyer, that some arrangement would have to be made with his wife, and he met her at respondent's office, but it does not appear whether this was before or after the visit to one of the judges. While we consider the actions of respondent in this matter inept, it appears to us, from the report, that Martin was not in any way deceived, and that respondent spent considerable time in trying to negotiate a divorce under circumstances which we know are ordinarily very difficult.

We have held that to justify the infliction of the heavy punishment of disbarment the case must be clear and free from doubt, both as to the act charged and the motive. ·(*In re Pelz,* 356 Ill. 200; *People ex rel. Chicago Bar Ass'n* v. *Gorindar,* 350 Ill. 256.) In addition to proving the specific acts the fraudulent motive must also be shown, (*In re Smith,* 365 Ill. 11;) and to warrant the extreme punishment of disbarment clear and satisfactory proof is required. (*In re Dunn,* 370 Ill. 413.) Proof of carelessness or mistaken judgment is not sufficient. The most serious dereliction of duty of respondent was in failing to apply the monies paid to him by Wiegel for the specific purpose, and in deceiving Mrs. Gann by telling her her divorce suit had been filed.

We have had before us many times disciplinary proceedings involving misapplication of money. In *People ex rel. Chicago Bar Ass'n* v. *Anderson,* 273 Ill. 37, *In re Zahn,* 356 Ill. 283, *In re Borchardt,* 357 Ill. 458, and *People ex rel. Chicago Bar Ass'n* v. *Chancellor,* 358 Ill. 112, we considered cases involving failure to account for collections, misapplication of funds, and conversion of funds entrusted to the attorney's care, and in each instance suspended the offending attorney for a period of two years. In three cases, where prominent attorneys collected large fees from their clients for the purpose of splitting them with the chairman of the Tax Commission, and being at

least indirectly guilty of bribery, we suspended the attorneys for a period of two years. (*In re Huff,* 371 Ill. 98; *In re Tuttle,* 371 Ill. 153; *In re Ellis,* 371 Ill. 113.) While we have held in *In re Both,* 376 Ill. 177, that misapplication and failure to account is ground for disbarment, yet that was a case where from repeated conversions and misapplications of clients' monies it appeared beyond question a corrupt motive and moral turpitude were clearly shown.

We have examined the report of the commissioners and the recommendations with care. Doubtless they were influenced in the recommendation as to the punishment to be inflicted by the cases referred to above. We do not think the extreme penalty of disbarment should be applied. The course of dealings between respondent and Wiegel indicates he continually performed services and made substantial payments in money and received little credit for services rendered. His retention of the money paid for tax purposes and collected from accounts left with him does not show moral turpitude, as we have defined it in *In re Needham,* 364 Ill. 65, by attempting to obtain money by fraud or false pretenses.

The report discloses Hallmann has not practiced law since 1939; that the publication of the complaints rendered it impossible to do so, and that respondent has made full reimbursement. In our opinion he has manifested a sincere intention to, in the future, comply with the ethical duties of an attorney at law. In view of our previous decisions and the mitigating facts pointed out above, we think the commissioners were justified in their recommendation that the respondent be suspended rather than disbarred.

Accordingly, it is the order of the court that the respondent, Herman F. Hallmann, be suspended from the practice of law for the period of two years.

*Respondent suspended.*