(No. 20850.—

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator,
*vs.* ISRAEL GORINDAR, Respondent.

*Opinion filed October 22, 1932.*

JOHN L. FOGLE, for relator.

WETTEN, PEGLER & DALE, for respondent.

Per CURIAM: This is an information filed at the April
term, 1931, to disbar the respondent, Israel Gorindar. The
charges made relate to his conduct in certain transactions
had by him with Meyer Mell.

Mell is a cousin of Gorindar's wife. For some years
before 1925 he was in the wholesale drug sundries business
in Chicago. He also engaged in various real estate deals
with his brother-in-law prior to the death of the latter, in
1922 or 1923. During that period his interests were repre-
sented by attorneys other than Gorindar. The first business

dealings between him and Gorindar were in 1925, when he had a talk with Gorindar about making investments, which resulted in the drafting of a written agreement. This agreement, dated June 20, 1925, provided that Mell was to invest his funds, in such amounts as he might desire, in second mortgages, reserving the right to refuse any securities of which he did not approve; that, as to any securities purchased through Gorindar, Mell relied entirely upon Gorindar's judgment as to their safety and legal validity; that the profits from the purchase of such securities should be divided equally, sixty per cent of Gorindar's profit share to be paid to him upon the purchase, and forty per cent to be retained by Mell until the securities were completely liquidated; that Mell was to pay Gorindar six per cent interest on the sums thus retained; that interest paid on securities was not considered profit, and only discounts obtained in each transaction were to be deemed profits; that Gorindar agreed to investigate the securities and advise Mell as to their safety to the best of his knowledge and to furnish all legal and other services necessary in such transactions, and that he further agreed to share one-half of any loss sustained by Mell by reason of the failure of any securities purchased as aforesaid and to pay the same to Mell. Mell and Gorindar operated under this agreement until the fall of 1927, the amount which Mell invested during that period being about $100,000. In 1927 Mell decided to purchase second mortgages from some company which was established in that line of business and which would afford him greater security than he enjoyed under his contract with Gorindar. After investigating the firm of Balch & Balch and securing reports on them from R. G. Dun & Co. and the Investors' Protective Bureau, Mell commenced dealing with them, the agreement being that they would pay him eleven per cent interest return on his investments, payable to him monthly, and that they would pay Gorindar on the basis of one per cent a year on each transaction. As each

deal was made Balch & Balch issued to Mell their written guaranty assuring the payment of principal and interest. The total investments made by Mell under this arrangement amounted to $180,000. All the books which pertained to Mell's investments were kept in Mell's office. In the summer of 1928 Mell made a trip to Europe and was away for several months. In his absence Gorindar dealt for him with Balch & Balch under a written power of attorney. After his return in December, 1928, Mell made no further investments through Balch & Balch.

It is desirable to consider separately the several matters which are relied upon by the relator. One of these may be referred to as the Julia Kryl transaction. The Kryl mortgage, in the sum of $3500, was bought under the contract of June 20, 1925, between Mell and Gorindar. Upon Mell's return from Europe Gorindar made to him a written report, headed, "In account with you and for moneys received on the following accounts and notes under power of attorney." Gorindar's statement is that this report was "just for the purpose of showing the transactions on account, that I might show how much money was supposed to be paid in and how much money was supposed to be paid out." In this report was an item entitled "on account of Julia Kryl." This item purports to show the receipt by Gorindar of four payments of $90 each, with interest, for the months of August, September, October and November. In fact, these payments had not been received by Gorindar. While counsel for the relator admits that the effect of this was to charge Gorindar with the money although it had not been received, it is contended that the purpose was to deceive Mell into believing that the mortgages were being paid so that he would be induced to renew them when they became due and to continue his business relations with Gorindar. It may be said, in the first place, that there is no direct evidence that such was Gorindar's motive. The investment in question was made under a written con-

tract between the parties which bound Gorindar to stand half the loss if there was one, and Gorindar, as well as Mell, had a personal pecuniary concern in its outcome. Assuming that the relation of attorney and client existed as between Mell and Gorindar, the situation was not one where the client was alone financially involved in the outcome and stood to suffer alone such loss as there might be. In any event, Gorindar testified that payments on this mortgage were in default before Mell left for Europe and that he informed Mell to that effect. Direct corroboration of this is found in the testimony of Abraham Skolnik, Mell's book-keeper at that time, that before Mell went to Europe he heard Gorindar tell Mell that Gorindar was making some of the payments on the Kryl notes. If Mell was so informed the argument made by the relator is without force. The record contains an exhibit dated May 12, 1929, which is partly in the handwriting of Mell and partly in that of his book-keeper and which contains the following statement: "G. becomes a partner to loan as of 2/1/28, on which date Kryl stopped making payments. On that date Kryl owed a balance of $2690. Therefore G. has to invest $1345. Instead of paying a lump sum of $1345 on 2/1/28, G. made ten payments at various dates, as shown on statement attached, totaling $1039.77. Therefore G. still owes a balance of $305.23. In addition M. is entitled to receive interest on balances remaining unpaid, totaling $59.06, as shown on schedule attached. Total indebtedness of G. to M. is $364.29." The record also contains a receipt signed by Mell and in which he acknowledged receipt of that sum. In this receipt Mell acknowledged that he retained notes secured by the Kryl mortgage amounting to $1700 and also a note for $2900, which was additional security and which was secured by another piece of property; also that he withheld notes totaling $400 which belonged to Gorindar. It is thus apparent that nearly two years before the information was filed Mell and Gorindar made an adjustment of

the matter between themselves and that Mell acknowledged receipt of what was due him in that deal.

The power of the court to disqualify attorneys-at-law is a judicial power and is not to be exercised in a despotic manner. The hearing is to be governed by rules of law and the evidence must be such as clearly proves the charge. The disbarment of an attorney is a serious matter to him, and this court is bound to weigh carefully the circumstances presented in any disbarment matter. (*People* v. *Gilmore,* 345 Ill. 28.) To justify the infliction of such heavy punishment as disbarment the case must be clear and free from doubt, not only as to the act charged but as to the motive. (*People* v. *Harvey,* 41 Ill. 277; *People* v. *Matthews,* 217 id. 94; *People* v. *Thornton,* 228 id. 42; *People* v. *Ader,* 263 id. 319.) In view of all the circumstances we cannot say that the evidence with respect to the Kryl transaction is sufficiently clear and free from doubt to justify the infliction of the penalty demanded.

Another matter upon which charges are based may be spoken of as the Dakof-Swerdlow transaction. Under the Mell-Gorindar contract of June 20, 1925, a second mortgage executed by Dakof was purchased. A few months after the purchase Dakof sold the property to Swerdlow, who agreed to pay the mortgage. As far as the record shows, payments were made up to the time that Mell went to Europe. While Mell was away Gorindar received checks covering two payments from Swerdlow and credited these payments to Mell's account. In the report made to Mell upon his return they were shown as having been received, although in the meantime the checks had been returned to Gorindar from the bank with a notation that the Swerdlow account had been closed. Counsel for the relator argues in this connection, as in the Kryl matter, that Gorindar's motive was to deceive Mell into believing that the mortgages were being paid when due, so that he would continue to do business with Gorindar along the same line. Mell did,

in fact, renew this mortgage on February 5, 1929. He testified that at the time he renewed it he did not know there had been any default and that it was not until after foreclosure proceedings had that he found out that the payments shown on Gorindar's report had not been made. Gorindar testified that he told Mell, upon the latter's return from Europe, that the Swerdlow checks had come back and that Swerdlow was trying to re-finance the property and that Gorindar was negotiating with other clients to re-finance it. Gorindar further testified that Mell said he would be interested in re-financing it; that Mell and he looked it over, and that Mell renewed the mortgage, not on the basis of the 1925 agreement but upon the basis of Gorindar's guaranty, in writing, of the payment of the loan and the payment to Gorindar of $277. The discount received by Mell was $1320. In the record is an exhibit in Mell's handwriting dated February 5, 1929, pertaining to this transaction. On it is shown as a credit to Gorindar an item, "To Swerdlow for taxes, expenses and payment of Rose Swerdlow, $765.84." Another exhibit dated the same day, describing the renewal transaction in greater detail and including Gorindar's guaranty, refers also to the sum of $765.84 "to I. Gorindar to apply on taxes, expenses and payments for Rose Swerdlow." The record also contains a check drawn by Mell to Gorindar's order in the sum of $765.84 and dated February 5, 1929. A proper interpretation of these exhibits is that they indicate Mell's knowledge of the true state of affairs before he renewed the loan, and they are corroborative of Gorindar's testimony to that effect. They also tend to impeach the testimony of Mell that he did not know of the default until after he foreclosed the renewal mortgage. Gorindar testified that Mell wanted to foreclose this mortgage but witness opposed such action; that Mell retained another attorney, who filed suit, joining witness as a complainant; that the defense of usury was set up; that witness was subpœnaed to testify, ·

and Mell asked him to testify that he received all of the $1320; that witness refused to so testify, and that Mell became angry and stated he would get even with witness.

It may be said with reference to this Dakof-Swerdlow transaction, as in connection with the Kryl matter, that there is no direct evidence of any improper motive on Gorindar's part. The report was made with reference to a deal in which he had a joint personal interest and stood to bear a joint personal loss. Assuming that the report itself was false, there is a direct conflict between the testimony of Mell and Gorindar as to whether Mell was informed of the true state of affairs before the loan was renewed. There is evidence which tends to corroborate Gorindar and to impeach certain statements made by Mell. While the making of a misleading report to a client cannot, under any conditions, be approved, and under ordinary circumstances might well be held to constitute ground for disbarment, taking everything into consideration here we are not prepared to say that the evidence is sufficiently clear and free from doubt as to warrant such an order.

The third matter relied upon by relator may be referred to as the Wallach transaction. In 1921 Mell bought a piece of property. Shortly after the purchase he sold it. Through some error in the deed one foot along the side of the lot was not included in the description. Although the property changed hands several times, no point was made of the discrepancy until 1927. Mell testified that Gorindar called on him and told him that the Chicago Title and Trust Company had found a cloud on the title and that Gorindar could get $50 for Mell and $10 for himself for a deed. Fannie Aron, a book-keeper employed by Mell and who is a sister of Gorindar's wife, testified that she heard a conversation between Mell and Gorindar in regard to some paper that Mell was to sign and that Mell was to sign it for a consideration of $50. In fact, Gorindar received $540 for Mell's deed and did not inform Mell as to exactly how much

he did receive, although he paid Mell $50. Gorindar testified that he first heard of this matter from Mell, who gave him a telephone number to call; that when witness called this number it proved to be that of Maurice Burr, an attorney representing the Wallachs, who then owned the property; that witness negotiated with Burr, who said the Wallachs would probably pay $50 for a deed; that witness told Mell they had offered $50 but that he could get more money than that, and that Mell said to get $50 for him and for witness to get what he could for himself to cover what Mell owed witness for previous transactions, including negotiations for the sale of Mell's business. Gorindar's testimony as to how the matter first came to his attention was corroborated by Burr. Gorindar further testified with reference to the items for which Mell owed him money at that time and which were three in number. The first pertained to an investigation made by Gorindar in the latter part of 1925 or the early part of 1926 of a number of transactions in which a former attorney of Mell had taken part. Mell suspected this attorney of fraud and desired to file charges against him with the Chicago Bar Association. According to Gorindar, it was agreed that Mell should pay him $10 for each transaction thus investigated. Gorindar investigated some thirty-two of these matters and reported to Mell that he had no ground for filing complaint. Mell denied that he ever retained Gorindar for such a purpose and testified that he knew nothing about it. However, when shown a six-page memorandum prepared in the handwriting of his book-keeper in this connection, he admitted that he supposed he instructed the book-keeper to give it to Gorindar. The second item allegedly owed to Gorindar at that time was interest on the forty per cent of his share of profits under the contract of June 20, 1925, and which in accordance with the terms of that agreement was retained by Mell. This was claimed by Gorindar to have then amounted to about $300. There is no showing that Mell ever directly paid this item

to Gorindar. Gorindar also testified that in further consideration of what he received from the Wallach deal he was to make no claim to any further interest that might accrue to him under the 1925 contract. The third item allegedly due Gorindar was compensation for assisting Mell to sell his business in 1927. Mell denied that Gorindar had anything to do with this. Gorindar testified that Mell had referred to him letters received in answer to newspaper advertisements and asked him to interview the parties, and he produced a memorandum in Mell's handwriting and given to him by Mell which outlined a sales talk for Gorindar to use in dealing with prospective purchasers.

We cannot approve the action of Gorindar in not reporting to Mell the amount that he received from the Wallachs. Whether an order of disbarment should be entered is, however, another question. Gorindar's testimony indicates not only that Mell owed him an amount substantially in excess of that which Gorindar retained, but that Mell agreed that whatever the Wallachs paid over $50 was to be Gorindar's. While Mell's testimony tends to dispute this, in some details it is impeached, and on the whole it does not constitute a clear and convincing basis for the action sought by the relator.

Counsel for the relator relies upon an alleged inconsistency between the position taken by Gorindar in this connection before the grievance committee of the Chicago Bar Association and that which he assumed before the commissioner. It is insisted that when he appeared before the committee he did not claim that Mell owed him money for investigating the thirty-two transactions and helping to sell the drug business and for interest on withheld profits under the 1925 contract. A portion of the transcript of proceedings before the committee shows the following:

Q. "How much was paid you by the Wallachs for that deed?

A. "$540.

Q. "What did you do with the money?

A. "I gave him $50 of it. That was the arrangement.

Q. "Did you have an arrangement with Mell through which he was going to get $50 out of it?

A. "That is what he wanted. That is not a single transaction. We had twenty-eight of these transactions of the same nature.

Mr. Merrick: "We will take one at a time. This one here is the Wallach transaction."

The transcript of the proceedings before the committee also shows the following:

Q. "What kind of an arrangement did you have with Mell by which he was to get only $50 out of this $540?

A. "Because that is just what he wanted. This is the way—I will tell you just how it occurred from the beginning. It is not only a single transaction. We had twenty-eight others on the same thing—

Mr. Merrick: "We will take the other twenty-seven when we get around to them. Let's stick to this Wallach transaction.

Q. "They paid you $540. What is that for?

A. * * * "I came back to him and told him all about it, and he said, 'I want $50. Whatever you make from the other fellow, that is for you.' That was not only this one, but twenty-eight others—

Mr. Merrick: "Let's stick to this one."

The transcript further shows:

Q. "Do you think that was fair and equitable?

A. "Yes, sir.

Q. "In dealing with a client?

A. "Yes, sir. If you will permit me to tell you of our arrangements—

Mr. Merrick: "Let's stick to one thing at a time."

A further portion of that transcript shows the following:

Q. "The deed was signed October 4th?

A. "I don't know that was the date. It shows on it. Although it is dated the 3d, I think I got the check when I brought the deed. If I didn't bring it, the man didn't give me the check until I brought it.

Mr. Merrick: "Did you tell him that you got $50 for the quit-claim deed?

A. "No, I did not.

Mr. Irwin: "That is all I want to know.

Mr. Gorindar: "I would like to be given a chance to explain all of these transactions.

Mr. Fogle: "You can suit your wishes about that transaction in regard to the $540.

Mr. Gorindar: "I am positive if you will let me explain my entire dealings with that man—I want to show the consideration that he received on account of this arrangement; that he was making money with all the things I have done.

Mr. Fogle: "You have done a lot.

Q. "You received $540 here and you gave him $50 and you did not tell him you received—

A. "He never asked me. He was not interested to know, because my arrangements—

Mr. Fogle: "This man is your client?

A. "Yes.

Mr. Fogle: "You got a quit-claim deed, for which you were paid $540, and you got that out of a deal with a client—

Mr. Gorindar: "Yes, but if you knew the whole truth about it—

Mr. Fogle: "That is the whole truth about that. Wait a minute—

Q. "You mean you made him money in the transactions you handled—a lot of claims?

A. "Yes.

Q. "And for that reason you believe you had a right to keep this $540?

A. "No, that wasn't the reason.

Mr. Fogle: "What is the reason?

A. "The reason was that he understood this was— I mean that if he had an arrangement that he wanted so much money, if he got that much, whether he knew that more was paid or not, it was a legitimate financial transaction.

Mr. Fogle: "This does not look like it. This looks quite the contrary. All right. That is all for to-night."

Before the commissioner Gorindar was asked what he meant by his reference before the grievance committee to twenty-eight transactions. The record then shows the following:

Q. "Just tell us what you meant by your answer to that question?

A. "What I meant to say is that I had twenty-eight transactions for him, and these went into this single transaction. I meant to refer to the investigation of these various transactions that went in as part of the consideration for the deed.

Q. "Did a later investigation show you that these transactions should be thirty-two instead of twenty-eight, Mr. Gorindar?

A. "After checking it over again I found that it was thirty-two.

Q. "Those were the transactions that you referred to, were they?

A. "Yes, sir.

Q. "The same as you testified to in this case?

A. "Yes, sir.

Q. "Tell us now, Mr. Gorindar, when you said, 'We had twenty-eight of these transactions of the same nature,' what you meant?

A. "What I meant is twenty-eight transactions that I had investigated for him and that went in as part of the consideration for this transaction of the deed.

Q. "What do you mean? For the money you got out of the deal?

A. "Yes, sir.

Q. "The $540?

A. "Yes, sir.

Q. "Did the committee let you explain fully with regard to the twenty-eight transactions?

A. "Well, I was interrupted by other questions that they asked me.

Q. "During the entire hearing did you ever tell them fully the nature of these transactions?

A. "I attempted to do that, but I didn't get an opportunity to tell them."

The record also shows the following:

A. "When I was before the grievance committee I had with me at that time before the committee the documents which have been marked in this case as exhibits 1, 2, 3, 4, 5, 6, 7, 8, 15, 16 to 21, inclusive, and 24. I identified those papers and had them with me at the time.

Q. "Did you ever offer them to the committee?

A. "I tried to.

Q. "Were they actually received and put in on your behalf?

Q. "Not that I know of."

The exhibits thus referred to included the 1925 contract with Mell, the memoranda showing the final settlement of the Kryl and Dakof-Swerdlow deals, the six pages of data given to Gorindar by Mell in connection with the thirty-two investigations, and the sales talk memoranda handed to him by Mell.

It is by no means clear that the position of Gorindar before the grievance committee was inconsistent with the one which he took before the commissioner. That he desired to render a fuller explanation than he was allowed to is evident. He testified that when he appeared before the committee he was under a great strain because his nephew had died three days before and that he had been at the bed of his dying sister for three nights. The explanation which

he offered to the commissioner as to what he meant by his statements before the committee is not an unreasonable one. The relator asserts, however, that by the twenty-eight matters referred to before the committee Gorindar must be held to have meant transactions under the contract between Mell and Balch & Balch, and that his inconsistency is established by the fact that before the commissioner he claimed that they were other transactions. No good reason is apparent for such a conclusion and there is no propriety in resorting to conjecture in an effort to impeach. Without proof of more conclusive character than this record discloses, an order of disbarment would be unwarranted.

The rule against respondent to show cause will be discharged. *Rule discharged.*