(No. 27400.—

IN RE MICHAEL OBARTUCH, Attorney, Respondent.

*Opinion filed March 21, 1944—Rehearing denied May 11, 1944.*

CHARLES LEVITON, of Chicago, *amicus curiae*.

WARREN H. ORR, and LOREN E. LEWIS, both of Chicago, for respondent.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This is a proceeding to strike respondent's name from the roll of attorneys. The Committee on Inquiry of the Chicago Bar Association filed a complaint with the Board of Managers and the Committee on Grievances of said association, sitting as commissioners of this court. It contained three charges. All the charges arose out of closely related actions in which respondent appeared as attorney and also as a witness. The first charge was that he gave willfully false and perjurous testimony. The second that he advised his sister-in-law Emily Obartuch to obtain a gun and shoot Stanley Feinberg and T. J. Barnett, or any other person attempting to serve process or subpoenaes of the district court of the United States, and the third that he threatened the life of A. J. Friedman if he appeared and testified for the defendant in a case then pending in the Federal district court in which respondent's

mother Julia Obartuch was plaintiff and Security Mutual Life Insurance Company was defendant. Respondent included in his answer a motion to strike the first charge on the ground of insufficiency. The motion was overruled. Evidence was heard by the second division of the grievance committee. It found respondent guilty on the first charge and that the proof was insufficient to establish the second and third. In its report filed January 7, 1943, it recommended that respondent be disbarred. Objections were filed to this report and a supplemental report was filed February 22, 1943, reducing its recommendation to suspension for two years. On May 7, 1943, the Board of Managers filed a special report increasing the recommendation to disbarment. Exceptions were duly filed by respondent.

Respondent was admitted to practice law in February, 1929. Since then he has practiced in Chicago. Several months prior to 1934, his father, Frank Obartuch, owned several pieces of real estate which he conveyed to his son Henry William Obartuch. At the time of the conveyance the father, mother, respondent and his brother were on friendly terms. In 1933 the father and mother had a disagreement and he left the home. He started suit in the superior court to set aside the deed by which he had conveyed the property to his son. Respondent, his mother and his brother were made defendants. None of the pleadings of that action are in this record and it is only by statements of counsel that we are apprised as to the issue and that is, by the most general term, that it charged fraud. Respondent appeared as the attorney for his mother, brother and himself. The evidence was heard before a master and during such evidence respondent testified. A part of his evidence is in the record by stipulation, which evidence is as follows:

"Mother came in. Mother signed it. She said, 'Well, that pays the debt that we owe you children. That is the

only way that we can do.' Dad took the $1,100. I cancelled some of the notes and my brother Henry cancelled some of the notes. Dad hasn't worked, I think, for upwards of eight years. He has been sick. I have spent on one doctor $900 for medical services and I paid the bill. Previous to that, Dr. Katz was treating Dad, and I paid Dr. Katz about $1200.

[Cross-examination]

"Q. Now, when did you pay this $900 for medical services that you spoke about for your dad?

"A. That was just about two or three years previous.

"Q. That was in what year?

"A. About three years ago.

"Q. Two or three years prior to 1933 or prior to now?

"A. To now.

"Q. About 1931?

"A. Maybe 1930 or 1931.

"Q. Who paid this $900, and this $1,200 medical bill?

"A. The $1,200 was paid when Dr. Katz was alive. That was his previous sickness. That may have been six or seven years ago.

"Q. Who was paying those bills?

"A. I was paying those bills.

"Q. That was six or seven years ago?

"A. Approximately about that time."

The record does not disclose the evidence, if any, that preceded or followed the·quoted part. It is agreed that the hearing at which he testified was held on May 24, 1934. The master's findings were in favor of the defendant. Frank Obartuch died soon after the master completed his findings in 1934 and no decree was entered.

In 1931 the Security Mutual Life Insurance Company issued two life policies for $10,000 each, purporting to be on the life of respondent's father. The wife of insured was named as beneficiary in both policies. After Frank

Obartuch died, Julia Obartuch, as beneficiary, started a suit against the insurance company declaring upon said policies. Respondent appeared as her counsel with another attorney. This action was filed in the Federal district court, but none of the pleadings of that case are in this record. It appears from the statement of respondent when testifying in this case, and from remarks of counsel, that each of the policies had provisions making them incontestable after two years from date. It appears that the insurance company defended on the grounds that the policies had been fraudulently obtained. The defense was that the insured Frank Obartuch was not examined for the insurance but that another was fraudulently substituted in his place. Respondent testified by deposition taken before a notary public on November 12, 1938, and when the cause was heard before the court on April 13, 1939, he was called as a witness. A part of his evidence given on cross-examination was introduced in evidence in this case. Such evidence covers eight pages of the abstract. It seems that counsel for the insurance company had a copy of or knew of respondent's testimony before the master in the Frank Obartuch action and was using it to impeach respondent in the insurance action. This record does not disclose whether the evidence in the Obartuch case was introduced in evidence in the Federal court or was used other than for reference purposes. The district judge found in favor of the insurance company and the United States Circuit Court of Appeals affirmed.

A few of the questions propounded by the insurance company's counsel and respondent's answers will illustrate the character of such evidence and obviate the necessity of long quotations from it. Only a part of the deposition taken in 1938 before a notary appears in this record. The first question propounded by counsel for the insurance company was:

"Q. Had he been sick at any time prior to this examination you are telling us about? I mean, in recent years before that?

"A. I know about once he had pneumonia. He may have been sick another time.

"Q. I mean we will say six or eight years prior to his death. Did you know of any serious illness your father had?

"A. I can't recall that he had."

A number of questions were asked as to where the father lived for a few months immediately preceding his death, and the opportunities respondent had to observe him. Then the following questions and answers appear:

"Q. Prior to the time of this examination by Dr. Rubins the only thing you recall in the six or eight years prior to his death was that he had an attack of pneumonia?

"A. It may have been ten years or even six years, but at the time I think he had pneumonia.

"Q. Was he sick for any long period of time at that time?

"A. No.

"Q. Would you say a week or so, or two or three weeks.

"A. I couldn't tell you definitely but there may have been some ailment, here or there, you know. Naturally, with all of us, there are some things, this or that.

"Q. Do you know any doctors who attended him prior to the time he was examined by this Dr. Rubins on the day we are speaking about, in June, 1931?

"A. He was a healthy man in 1931.

"Q. Well for six or eight years prior to 1931, do you know of any doctors who treated him?

"A. Gosh! I couldn't answer that definitely right now.

"Q. Isn't it a fact that he was sick for six or eight years prior to 1931?

"A. That would be 19—.

"Q. Say 1925 to 1931? Did you pay out any doctors' bills for doctors treating him from 1925 to 1931?

"A. There may have been some what you call doctors' bills that I may have paid. I think I may have.

"Q. Some small amount?

"A. I don't recall definitely what it was, whether it was small or large; so many things has gone since that time. It was a matter of routine. I couldn't go and tell you definitely now.

\* \* \* \* \* \* \* \*

"Q. Do you recall any doctor who treated him from 1925 to August 1933? A. I couldn't answer that definitely sure.

"Q. Isn't it a fact that you paid one doctor for treating your father between 1925 and 1933 or sometime during that period the sum of $1200? \* \* \*

"A. I couldn't tell you that definitely.

\* \* \* \* \* \* \* \*

"Q. Isn't it a fact that prior to August 1933 you paid one doctor in the aggregate the sum of $1200 and another in the aggregate the sum of $900 for treatment of your father?

"A. I don't think so; I might have, I have paid some money for doctor's bills.

"Q. You said your father was a healthy man?

"A. About 1925 he was a healthy man.

"Q. From 1925 to August 1930 was he at all times a healthy man outside of this attack of pneumonia you have told us about?

"A. He may have had—I told you he may have had some little ailment here or there, and I may have paid a few dollars here and there. As to the amount, I couldn't tell you definitely; it is too far back."

Respondent was interrogated at length in reference to whether his father was physically able to work during the

years 1925 to August 1933. He stated that his father was in the real estate business for himself a part of that time and in the mercantile business a part, able to give it attention and do such work as was necessary to care for such business. He testified that Dr. Katz was the family physician and was asked whether any member of his family paid Dr. Katz $1200 for the illness of the father prior to August, 1933, to which he answered: "I couldn't say that definitely; that is some time back. He is the family doctor. I may have paid for some treatments, maybe, for Dad, maybe for Mother, maybe for my brother. I couldn't tell you definitely. Q. You don't know of any such doctor treating your father prior to August 1933? A. To my knowledge or recollection, no. It may have been, I don't know."

He was then asked as to whether he recalled having paid $900 prior to June, 1931, for the illness of his father. He answer: "I tell you I don't recall. I never heard of Dr. Schraub, or any name similar to Dr. Schraub." . (It does not appear that the name of Dr. Schraub was referred to by respondent in any previous testimony.) He was then asked, "Didn't you testify in the suit in the Superior Court of Cook County where your father was suing your brother Henry William Obartuch and yourself and your mother, that during the period of six or seven years prior to August 1933, that your father had been continuously ill, unable to perform any work? A. I don't recall. That is all forgotten. Q. Didn't you in the same matter, in the same case and at the same time testify that you had paid Dr. Katz the sum of $1200 for treating your father for a period of six or seven years prior to August 1933? A. There may have been some testimony that certain moneys was paid to certain doctors of which I don't recall at the present time."

On the trial in the Federal court in 1939 he was asked as to what sickness his father had prior to June, 1931.

He answered: "I knew that he was complaining about rheumatism quite a bit and there may have been one or two ailments that he had, and which I did not remember at that time and I may not even remember now."

Counsel for the insurance company asked him as to the questions and answers in the deposition in reference to his father having had pneumonia. When read to him he admitted that he answered as stated. He was asked as to whether or not he paid $1200 to Dr. Katz five years prior to 1931 on account of the illness of his father, to which he replied: "No I did not, but what happened was this; during the period of time of approximately——." At this point counsel for the insurance company interrupted and he was not permitted to give further explanation to his answer. He was interrogated as to the answers he made on the hearing in the superior court case in reference to the $900 paid to one doctor for medical services and $1200 paid to Dr. Katz. His answer was: "Yes. You can go on further and see—you will find in the record I think an explanation of it; over a period of years that this money came and I paid some of the bills; and the record will further show some bills were paid by other members of the family. My testimony was for a period of time, for his attack of rheumatism, we were paying for the treatment, that was the reason there was so much money expended."

The law is well established that in disbarment proceedings the evidence must be clear and free from doubt, both as to the act charged and as to the motive. (*In re Greenberg,* 380 Ill. 417; *People ex rel. Chicago Bar Ass'n* v. *Gorindar,* 350 Ill. 256.) Respondent testified on the hearing before the commissioners but his evidence was largely in explanation of his former testimony. If it had any bearing upon any issue, it was upon the question of his motive in giving his former testimony. The motive for the answers given when under oath in the Federal and superior court

hearings is best shown by the records of those proceedings. The belated, self-serving explanations, given on the present hearing, are entitled to little weight on that question.

Evidently the commissioners in recommending respondent's disbarment were influenced in some degree by the thought that the record showed respondent to be guilty of giving, willfully, false and perjurous testimony, for such finding was included in their report. If the record presented sustained such finding the recommendation would be readily approved. Whether the misconduct charged amounts to a crime or merely to professional misconduct, such charge must be proved by clear and convincing testimony. (*People ex rel. Chicago Bar Ass'n* v. *Lotterman,* 353 Ill. 399; *People ex rel. Cline* v. *Kerker,* 315 Ill. 572.) Disregarding for the moment the evasiveness of some of respondent's answers to the questions asked, there are inconsistencies in the evidence given on the various occasions. But there is nothing in the record from which it can be determined when he spoke the truth and when he testified falsely. One of the essential elements of the crime of perjury is that it is necessary to prove not only the substance of the testimony which is charged to be false, but also to prove that it was false. (*People* v. *Fudge,* 342 Ill. 574.) Furthermore, perjury is willfully, corruptly and falsely testifying in a matter material to the issue or point in question. (*People* v. *Glenn,* 294 Ill. 333.) The issues in the cases on which respondent was testifying are not clearly shown. It is said that the charge in the superior court was fraud, but such allegation is general and not sufficient to show how respondent's testimony in that case was material to the issues made by the pleadings. The defense made by the insurance company was that there was a substitution of someone for the insured. From the limited facts before us, it does not appear how respondent's evidence as to the medical bills paid for his father covering a period of years prior to the issuance of the policies could

be material. If Frank Obartuch was the one actually examined by the company's medical experts, then his condition of health in prior years would, under the incontestable clause, become irrelevant. The facts do not disclose respondent committed perjury.

It is not to be inferred from anything that has been said that orders of disbarment are limited to those cases where there has been proof of a crime. Clear and convincing proof that a respondent's misconduct contains the elements essential to the establishment of a crime leaves little question as to the motive with which the act was committed, but proof of professional misconduct, without all the essential elements of a crime, may supply the motive and be sufficient to warrant disbarment.

In this case, respondent was appearing as attorney in the cases where he testified as a witness. The practice of appearing in such a dual capacity has been condemned in this court in many cases, some of which are *Crescio* v. *Crescio*, 365 Ill. 393; *Weiderhold* v. *Weiderhold*, 305 Ill. 429. But that fact alone is not sufficient upon which to base disciplinary action. The role in which respondent placed himself charged him with knowledge of all the facts on which his client's cases rested. With a knowledge of those facts he should have been in a position to have given clearer and more definite answers. His answers in one case as compared with those in another lack consistency and furnish the basis for the inference that he was withholding certain information. This evasiveness, indefiniteness and apparent attitude of keeping from the court something which as a witness he should have testified to, makes him subject to some disciplinary action. We do not find the evidence sufficient to warrant disbarment, but conclude that respondent's right to practice law should be suspended for three years.

*Respondent suspended.*